## SUPREME COURT.

The People '*ex rel.* Sidney H. Stuart agt. Francis W. Edmonds, Chamberlain of the City of New-York.

By an act of the legislature passed July 11, 1851, the board of supervisors for the city and county of New-York are authorized to increase the salaries of the police and civil justices and clerks elected and appointed under the act of 1848 for said city : and the salaries to be thus fixed are *not to be increased or diminished* during the term for which they are elected or appointed.

Therefore *held*, that a resolution of the board of supervisors of the 27th December, 1853, allowing to the relator, as a police justice, $666.66 for extra services, performed on Sundays, was null and void, and in contravention and violation of the statute of 1851. Under their general powers, the board of supervisors had authority to allow this remuneration, but the act of 1851 had restricted them.

*New-York Special Term, September*, 1854. This is an application made on behalf of Sidney H. Stuart, one of the police justices of the city of New-York, for a peremptory mandamus, commanding the chamberlain, in his capacity of treasurer of the county, *ex officio*, to pay him the sum of six hundred and sixty-six dollars and sixty-six cents, for a compensation directed to be paid to him by the resolution of the board of supervisors of the 27th December, 1853, for extra services.

The relator was elected one of the police justices of the city in November, 1851, and entered upon the duties of his office on the following May, and has ever since continued to discharge those duties.

John W. Edmonds, *for relator.*
Robert J. Dillon, *for chamberlain.*

Clerke, Justice. The question to be considered is, whether the board of supervisors had the power to make this allowance for extra services. Under the general power, which they possess by common law and by statute, they can allow all amounts chargeable against the county, (1 R. S. 367, § 4,) which comprise the prosecution and conviction of criminals, and all contingent expenses necessarily incurred for the use and benefit of the county.

The services alleged and admitted in the present case have been rendered, in my opinion, to the county, as contra-distinguished from the city in its municipal capacity.

The office of police justice is not of municipal but common law origin; it is entirely independent of the charter; and, if we were reduced by a repeal of it to the *status* of a mere county, this office would still essentially survive, exercising duties, always belonging, according to the general law of the land, to justices of the peace.

The legislature, to be sure, has distributed the duties of the justices, as far as this city is concerned, and has directed that the civil and criminal business should be discharged by different classes: one class to be confined exclusively to civil, and the other to criminal business. But this is merely a convenient division of labor, an arrangement which may be adopted with equal benefit, whenever the population or circumstances of any locality render it desirable, whether possessing or not a municipal charter.

Besides, even if this office were purely municipal, and entirely co-existent with and dependent upon the charter, still, if the services were rendered to the county, the board of supervisors had authority to grant compensation for those services, or for county services rendered by any individual, whatever may be his occupation, office, or condition.

The services, which they intended to compensate by the resolution of 1853, were rendered by the police justices on Sundays, which, by the common law, no public officer is under any obligation to perform, but which, in a crowded and heterogeneous population, are absolutely necessary to prevent rioting and disorder, and the escape of criminals.

The board of supervisors, then, having the general authority to order this additional compensation, the only question that remains, in this stage of the inquiry, is, whether they have been restricted or prohibited from doing so by the paramount authority of the state legislature, or, in other words, has their general power in this respect been curtailed.

In chapter 153, *Laws* 1848, *p.* 249, in the 9th section of an

People *ex rel.* Stuart agt. Edmonds.

act in relation to justices and police courts in the city of New-York, passed March 30th, 1848, it is provided, "that the justices shall receive such an annual compensation for their services as shall be fixed by the common council, which shall be in lieu of all fees and other perquisites, and shall not be increased or diminished during their continuance in office, and shall receive no other perquisites whatever by virtue of their offices."

Pursuant probably to this act, the board of supervisors by a resolution of 23d April, 1851, allowed the police justices for services rendered by them on Sundays, from the 9th day of May, 1848, to the date of the resolution, " at the same rate of compensation *per diem* as the salaries then paid them, for services performed in the ordinary business and legal days of the week ;" that is, they increased the salaries one-sixth for those additional services, and this, they had undoubtedly the power to do.

By an act of the legislature, passed July 11th, 1851, section 6th, this 9th section of the law of 1848, above referred to, was repealed, and for the increase of duties created by this act (including the services rendered on Sundays) the board of supervisors are authorized to increase the salary of the justices and clerks elected and appointed under the act of 1848; and the salaries to be thus fixed are *not to be increased or diminished* during the term for which they are elected and appointed.

According to this act, then, the board of supervisors, while authorized to increase the salaries of officers elected and appointed under the act of 1848, during the term for which they are elected and appointed, are absolutely prohibited, after thus increasing and fixing, *from again increasing or diminishing their salaries.* This prohibition applies to the police as well as to the civil justices, for both are equally appointed and elected under that act—the 4th, 5th, 6th, and 10th sections applying specially to the civil justices, and the 7th and 8th to the police justices ; the other sections applying in common to both.

Pursuant to the power given by the act of 1851, the board of supervisors, by a resolution of January 2d, 1852, fixed the salaries of the police and civil justices at two thousand dollars

People *ex rel.* Stuart agt. Edmonds.

per annum, "to be in full for services rendered by them on Sundays as well as all other duties assigned them."

As we have observed, they had specific power to do this by the act of 1851; but, having done so, they are positively restrained, by the same act and section, from making any further increase during the continuance of the term for which the incumbent has been elected.

The relator was elected in November, 1851, his term of office to commence on the following May, for four years.

How, then, in the face of the statute of 1851 could the board of supervisors pass the resolution of December 29, 1853, ordering the police justices to be paid for extra services at the rate of one-sixth of the compensation they now receive, contemplating evidently extra compensation for the services rendered by them on Sundays; although by resolution of January, 1852, it is expressly specified that the salary of two thousand dollars per annum is to be in full for services rendered by them on Sundays?

This resolution appears to me to be in contravention and violation of the act of 1851; and, although under their general powers, as I have already shown, the board of supervisors had full power to allow this remuneration, yet as the supreme legislative authority has thus limited those powers, the resolution of 1853 is null and void.

Having arrived at this conclusion, it is unnecessary to consider the points taken by the counsel of the defendant, whether the amount claimed was payable by the comptroller, or chamberlain, and consequently whether a *mandamus* could be granted against the latter, even if the relator were entitled to the amount which he demands.

It was mentioned on the argument in support of the relator's claim, that the police justices were entitled to a larger salary than the civil justices, and that both classes of officers by the resolution of 1852, being placed on an equality in this respect, allowing to both without distinction $2,000 per annum, the resolution of 1853, giving an increase to the former, was equitable, and should be favorably entertained by the court. I

readily admit that both in the nature and amount of their labo·
the duties of the police justices are much more onerous and
severe than those devolving on the justices of the inferior civil
courts.   They have to attend at unseasonable hours, and with
little intermission for relaxation or repose; they are even ex-
cluded from the sacred rest of the Sabbath; they are con-
strained to witness, day after day, scenes most revolting to
humanity—scenes calculated to make the hardest heart mourn
over the destitution and moral ruin of our race; they have
human nature perpetually and practically before them, in its
vilest and rudest aspects; and the actual physical and mental
toil which those duties impose must be seriously detrimental to
their health.

But, in my opinion, this inequality and inadequacy of remu-
neration can only be corrected by the intervention of the legis-
lature—by the repeal or amendment of the act of 1851.

The application must be denied.